UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WARREN DIAMOND and FAITH
DIAMOND, as Trustee of the
Diamond Trust,

                        Plaintiffs,                           21-cv-2604 (PKC)

              -against-                                 OPINION AND ORDER

SCOTT DIAMOND and
SLD 500, LLC,

                                    Defendants.

_____

CASTEL, Senior United States District Judge:

              Plaintiff Warren Diamond is the grantor and sole beneficiary of the Warren

Diamond Trust (the "Trust") and the father of defendant Scott Diamond.  Plaintiff Faith

Diamond, Warren's wife, is alleged to be the sole trustee of the Trust (the "Trustee").  Scott

Diamond is also alleged to be the sole member of defendant SLD 500, LLC ("SLD 500").

              The Amended Complaint (ECF 8) invokes the Court's diversity jurisdiction and

asserts claims for specific performance and breach of a December 2012 agreement between and

among Warren, Scott and multiple other parties (the "Agreement").  The Agreement governs the

manner in which payments are to be made relating to a Manhattan real estate investment.

Warren and the Trustee claim as many as 71 breaches of the Agreement, each representing a

required payment, exposing Scott and SLD 500 to $250,000 in liquidated damages for each of

the alleged breaches, a total of up to $17,750,000.  Warren and the Trustee do not seek an award

of actual damages.  (Tr. at 12-13.)[1]  Discovery in this action is closed.  Trial by jury has been

demanded.  The Court held the Final Pre-Trial Conference, at which it became apparent that the

dispute, largely, if not entirely, turned on matters of contract interpretation.  The Court

ascertained that neither side was asserting any ambiguity in the Agreement that was material to a

claim or defense.  (Id. at 4.)  Many of the background facts are set forth in the 67 paragraphs of

the "Stipulations of Fact" contained in the proposed Joint Pre-Trial Order.  (ECF 101.)

        Rule 16(c)(2)(A), Fed. R. Civ. P., empowers the Court to adopt procedures

"formulating and simplifying the issues, and eliminating frivolous claims or defenses."  At the

Final Pre-Trial Conference, the Court set a full round of briefing on the issues of contract

interpretation to guide the conduct of the trial.  The briefing now demonstrates that under New

York law, including its principles of contract interpretation, Warren and the Trustee have no

viable claim for relief against Scott or SLD 500.[2]

I.          BACKGROUND

      A.      The Parties to the Agreement.

        The foundational document for plaintiffs' claims is the 2012 Agreement, annexed

as Exhibit A to the Amended Complaint.  Warren Diamond, Scott Diamond and SLD 500 are

parties to the Agreement, together with three other parties: Tunnel Associates, LLC, Mitchell

Rutter, and Jacob Frydman.  The Warren Diamond Trust is not a party to the 2012 Agreement.

(ECF 8-1 at 1, 29.)

---

[1] All citations in the form "Tr.__" are to the transcript of the November 29, 2023 Final Pre-Trial Conference (ECF 117).

[2] The Court applies the standard governing a motion for judgment on the pleadings, Rule 12(c), Fed. R. Civ. P.  It draws all reasonable inferences in favor of plaintiffs.  Johnson v. Rowley, 569 F.3d 40, 43-44 (2d Cir. 2009).

The 2012 Agreement concerns certain real property located at 500 10th Avenue in Manhattan (the "Property").  According to its recitals, the Agreement is an outgrowth of a 2002 operating agreement governing the Property, two 2005 and 2009 settlement agreements, and "certain disputes . . . among Tunnel on the one hand, and Scott Diamond and Warren Diamond with respect to their respective rights and obligations pursuant to the Lincoln Operating Agreement and the Settlement Agreements. . . ."  (Id. at 1-2.)  The 2012 Agreement reflects that "the Parties have agreed to settle their disputes. . . ."  (Id.)

The Property is owned by 500 Lincoln Owner, LLC ("500 Owner") and currently leased by DHL, USA, Inc.  (ECF 101 ¶¶ 1, 2.)  500 Owner's sole member is another LLC, 500 Lincoln, LLC ("500 Lincoln").  (Id.)

500 Lincoln has two members, both of which are also LLCs: Tunnel Associates, LLC ("Tunnel") and Corem Capital Partners, LLC ("Corem").  Tunnel and Corem each own 50% of 500 Lincoln.  (Id. ¶¶ 3.)  Tunnel's members are entities controlled by two non-parties to this action, Jacob Frydman and Mitchell Rutter.  (Id. ¶ 5.)

Corem has three members: two other non-parties to this action (John del Monaco and Sal Cannizzaro) and the Warren Diamond Trust.  (Id. ¶ 4.)  The Trust owns 25% of Corem and therefore owns 12.5% of 500 Lincoln.  (Id.)  This 12.5% ownership by the Trust is important to the understanding of Paragraph 3(d) of the Agreement, which will be discussed.

500 Lincoln also has two co-managers: Tunnel and SLD 500, LLC.  SLD 500's sole member and manager is Scott Diamond.  (Id. ¶¶ 6-7.)

B.     <u>Distributions Pursuant to Paragraph 3(d)</u>

The Agreement provides (at Paragraph 3(a)) that, with specified exceptions, "all proceeds of every nature whatsoever" due to or received by 500 Owner, 500 Lincoln and/or 500 Tenth, LLC shall be deposited into 500 Lincoln's account at Citibank N.A (the "Lincoln Citi Account").  (ECF 8-1 ¶ 3(a).)  The Agreement defines the term "Lincoln Citi Account" and includes the account number and the Citibank branch number.  (<u>Id.</u>; ECF 101 ¶ 19 n.1.)

Paragraph 3(d) provides to whom and when payments shall be made from the Lincoln Citi Account.  While the entirety of Paragraph 3(d) is set forth on Appendix A to this Opinion and Order, the operative language relating to the distributions to the Trust provides as follows: ". . . 500 Lincoln shall make automatic monthly distributions from the Lincoln Citi Account of <u>all</u> <u>sums</u> then in the Lincoln Citi Account in excess of fifty thousand Dollars ($50,000) as follows: . . . (v) twelve and one-half percent (12.5%) as directed by Scott Diamond (or his successors as trustee of the Warren Diamond Trust)."  (ECF 8-1 ¶ 3(d) (emphasis in original); ECF 101 ¶ 19.)

Thus, the obligation to make distributions to the Trust rests upon 500 Lincoln, and the right and duty to direct where the distributions shall be made rests upon Scott Diamond or his successors as Trustees of the Trust.

C.     <u>Scott Diamond Ceases to be a Trustee of the Trust</u>

The Trust was created by a 2005 instrument that is governed by Florida law (the "Trust Agreement").  (ECF 8 ¶ 2(c); ECF 8-2 at 2-3; ECF 101 ¶ 11.)  Upon creation of the Trust in 2005, Scott served as its sole Trustee.  (ECF 8 ¶ 30; ECF 101 ¶ 11.)  "From the Diamond Trust's inception through April 21, 2015, the proceeds from the Property, 500 Lincoln, 500

4

Owner, and 500 Tenth associated with the Diamond Trust's 12.5% ownership interest in the Property were distributed to Warren Diamond or at his instruction."  (ECF 8 ¶ 32; see also ECF 101 ¶ 23.)

On July 7, 2015, Warren Diamond, the grantor and sole beneficiary of the inter vivos Trust, appointed his wife (and Scott's stepmother) Faith Diamond as co-Trustee.  (ECF 101 ¶ 28.)  A month later, on August 7, 2015—after, in Warren's view, his instructions were disregarded—Scott was removed as Trustee and Faith became the sole Trustee of the Trust. (ECF 8 ¶¶ 33-36; ECF 101 ¶¶ 29-33.)  The efficacy of Scott's removal was litigated in the United States District Court for the Southern District of Florida, which ultimately issued a ruling in favor of Warren and against Scott on December 18, 2018, confirming that Scott's removal in 2015 was proper.  (ECF 8 ¶ 41; ECF 8-2 at 7.)

II.        DISCUSSION

A.      Construing the Roles of Each Party

To resolve the questions of law regarding the interpretation of the 2012 Agreement, the Court will construe the rights and obligations of each party under this Agreement.  The Agreement expressly designates its governing law as the law of New York. (ECF 8-1 ¶ 24(a).)

1.  Contract Interpretation

"Under New York law, 'the initial interpretation of a contract is a matter of law for the court to decide.'"  Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England, 136 F.3d 82, 86 (2d Cir. 1998) (quoting K. Bell & Associates, Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996)).  "The question of whether the language

of a contract is clear or ambiguous is a question of law to be decided by the court." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157–58 (2d Cir. 2000) (citation omitted).  "The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement."  Id. (citation omitted).

   "Under well-settled New York law . . . a contract 'that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'"  Utica Mutual Insurance Company v. Fireman's Fund Insurance Company, 957 F.3d 337, 344 (2d Cir. 2020) (quoting Global Reinsurance Corporation of America v. Century Indemnity Company, 30 N.Y.3d 508, 519 (2017)) (citation omitted).  When a court construes a contract, it must "'give full meaning and effect to the material provisions' of the contract, and '[a] reading of the contract should not render any portion meaningless.'"  Id. (quoting Beal Savings Bank v. Sommer, 8 N.Y.3d 318, 324–25 (2007)).

   Two portions of Paragraph 3(d) are relevant here.  The main clause reads, "500 Lincoln shall make automatic monthly distributions . . . ." from the Lincoln Citi Account to various parties.  Sub-clause 3(d)(B)(v) then provides that 12.5% of the funds above $50,000 in the Lincoln Citi Account shall be paid by 500 Lincoln "as directed by Scott Diamond (or his successors as trustee of the Warren Diamond Trust)."  (ECF 8-1 ¶ 3(d)(B)(v).)  In other words: this paragraph obligates 500 Lincoln to make a payment of 12.5% of the funds in the way that Scott Diamond or his successors as Trustee of the Trust directed.  Because essentially all of plaintiffs' claims are that Scott and SLD 500 somehow "caused" 500 Lincoln to issue these payments, the Court must analyze whether it is possible that either Scott individually or SLD 500 as a co-manager of 500 Lincoln had the ability to cause 500 Lincoln to make payments.

The Court will look at the plain text of the contract, which was negotiated by sophisticated businesspeople, to interpret it.  See Vermont Teddy Bear Company, Inc. v. 538 Madison Realty Company, 1 N.Y.3d 470, 475 (2004) (citations omitted) (noting that "the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length" and that, "[i]n such circumstances, 'courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include'").  (See also ECF 122 at 3 (plaintiffs asserting that "[e]ach of the parties to the 2012 Agreement, including Scott Diamond and SLD 500, was experienced and well-versed in real estate ownership and management, particularly in the sophisticated New York City market, and was represented by sophisticated counsel").)

## 2. Scott Diamond

The Court first construes Scott Diamond's obligation and role under Paragraph 3(d)(B)(v), which reads, "twelve and one-half percent (12.5%) as directed by Scott Diamond (or his successors as trustee of the Warren Diamond Trust)."  (ECF 8-1 ¶ 3(d)(B)(v).)  The Court concludes that Paragraph 3(d)(B)(v) refers to Scott's obligations as Trustee of the Warren Diamond Trust.

The 2012 Agreement carefully delineates Scott's obligations in his various roles throughout its provisions: in his individual capacity, as Trustee of the Trust, and as manager of SLD 500.  Paragraph 2, for example, contains several representations and warranties by "Scott Diamond" as an individual.  (See id. ¶ 2(b) ("Scott Diamond hereby represents and warrants and agrees and covenants to Tunnel, Frydman and Rutter that: (i) SLD 500 LLC was formed by him solely to act as a co-manager of 500 Lincoln and 500 Tenth (and, if acceptable to Corem, Corem)

7

and for no other purpose; (ii) that on the date hereof Scott Diamond in his individual capacity is a co-manager of Corem; (iii) that Scott Diamond owns 100% of the membership or other ownership interests in SLD 500 LLC; (iii) that Scott Diamond is the sole manager or sole managing member of SLD 500 LLC; (iv) that . . . Scott Diamond shall not: (a) sell SLD 500 LLC or any interests therein; (b) permit any other person to own any membership or other interest in SLD 500 LLC. . . .").)

Paragraph 2(c) then expressly differentiates between Scott as an individual and SLD 500 when it provides, "In the event that Scott Diamond in his individual capacity (or SLD 500 LLC, if it has become a substitute manager of Corem) shall cease to be a manager of Corem, then such event shall be deemed the automatic resignation of SLD 500 LLC as co-manager of 500 Lincoln and 500 Tenth."  (<u>Id.</u> ¶ 2(c).)  It is clear throughout the 2012 Agreement when it is referring to Scott individually and when it is referring to Scott in his other roles.  In Paragraph 10, for example, the Agreement names "Scott Diamond" as designated tax matters partner, provides that "Scott Diamond shall cause a draft of each tax return proposed to be filed on behalf of 500 Owner, 500 Lincoln and/or 500 Tenth to be sent to Frydman and Rutter," and notes that "Scott Diamond shall be authorized to timely file said tax returns . . . ."  (<u>Id.</u> ¶ 10.)  And Paragraph 11 provides, among other things, that fifty percent of the proceeds of the sale of a certain "39th Street Property" should be paid "to Corem (wired into a Corem bank account as directed by Scott Diamond)."  (<u>Id.</u> ¶ 11.)  Again, Scott Diamond is manager of Corem in his individual capacity—<u>see</u> Paragraph 2(b)(ii)—and so this parenthetical merely names "Scott Diamond" without any further qualification, thus referring to him in his individual capacity.[3]

---

[3] <u>See</u> <u>also</u> <u>id.</u> ¶ 12 (Warren and Scott acknowledging that the "Diamond Trust, as a partner in 500 Lincoln, is bound" to an indemnity agreement dated December 2010); <u>id.</u> ¶ 13 (providing for either Frydman, Rutter, or Scott to cause legal fees to be paid, including fees for "counsel for Scott Diamond"); <u>id.</u> ¶ 14 ("Scott Diamond shall cause lawyers representing plaintiffs in the New Diamond Action to file the necessary documentation for the discontinuance with

But in contrast to these references to Scott in his individual capacity, Scott is also explicitly named in his capacity as manager of SLD 500 in other provisions of the Agreement. Paragraph 3(d) and Paragraph 4(a) both refer to Scott in his role as manager of SLD 500.  (See id. ¶ 3(d) (". . . except as may be determined in a subsequent written agreement signed and notarized by Frydman (or his successors as manager of Tunnel) and Rutter (or his successors as manager of Tunnel) and Scott Diamond (as manager of SLD 500 LLC, or his successors, as manager of SLD 500 LLC) 500 Lincoln shall . . . ."); id. ¶ 4(a) (". . .no payments or withdrawals of any type or nature shall be made out of the Lincoln Citi Account, or out of any other account now or hereafter maintained by 500 Owner, 500 Lincoln, and/or 500 Tenth, without the express prior written and notarized agreement of Frydman (or his successors as manager of Tunnel) and Rutter (or his successors as manager of Tunnel) and Scott Diamond (as manager of SLD 500 LLC, or his [successors] [sic] as manager of SLD 500 LLC) or by the joint signatures of Frydman (or his successor as manager of Tunnel) and Rutter (or his successors as manager of Tunnel) and Scott Diamond (as manager of SLD 500 LLC, or his successors as manager of SLD 500 LLC) on any check, wire instruction or other instrument.").)  Similar language appears with the same parenthetical designations of Scott, Rutter, and Frydman's roles as managers in Paragraphs 3(b), 3(e), 4(b), 4(d), 5(a)(i), 5(a)(ii), 6, 7, 8, 11, and 22.

The Court finally turns, then, to Paragraph 3(d)(B)(v), which reads, ". . . 500 Lincoln shall make automatic monthly distributions from the Lincoln Citi Account . . . as follows: . . . B) . . . to the beneficial owners of Tunnel and Corem, proportionately as follows: . . . (v) twelve and one-half percent (12.5%) as directed by Scott Diamond (or his successors as trustee of the Warren Diamond Trust)."  (Id. ¶ 3(d)(B)(v).)

---

prejudice of the New Diamond Action."); id. ¶ 23 (providing separate "notice" sections for Corem and for "Scott Diamond").

This is the <u>only</u> place in the Agreement in which Scott is designated with a parenthetical reading "or his successors as trustee of the Warren Diamond Trust."  The other individual names in Paragraph 3(d)(B)(i)-(iv) are all followed by a parenthetical reading "or [his/their] successors," with no further qualification; Scott is the only person whose parenthetical includes "as trustee of the Warren Diamond Trust"—or, in fact, any qualification at all.  The addition of this qualifier and the absence of such qualifiers for the other individuals named in this paragraph also weigh against finding that this clause refers to Scott in his individual capacity.  The conclusion that the reference to Scott is in his capacity as Trustee is further buttressed by the fact that this paragraph lays out the payments in proportion to each party's ownership interest in 500 Lincoln and that this clause represents the 12.5% due to the Warren Diamond Trust.

The Court concludes that the intent of the parties was to obligate Scott in his role as Trustee or Scott's successor Trustees to direct payment instructions for 500 Lincoln to follow regarding the Trust's 12.5% distribution.  Cf. <u>TKS Realty, LLC v. 391 Broadway LLC</u>, 192 A.D.3d 572, 573 (1st Dep't 2021) (citation omitted) (construing obligations under contract and concluding that the "individual defendants' obligation to personally guaranty the buyout option is set forth in clear and explicit language, making their intent unmistakable"); <u>IKB International, S.A. v. Wells Fargo Bank, N.A.</u>, 40 N.Y.3d 277, 285 (2023) (analyzing language in agreements and concluding that such language "make[s] clear this circumscribed scope of duties" of the defendants).

The Court also concludes that Paragraph 3(d) of the Agreement obligates 500 Lincoln to make certain payments, not SLD 500 or Scott individually, and that under Paragraph 3(d)(B)(v), Scott as Trustee or his successor Trustees had the right to direct 500 Lincoln how to make the Trust's 12.5% distribution payment.  As will be discussed in detail below, plaintiffs

have not advanced a contract-based theory under which SLD 500 or Scott can be held liable for

500 Lincoln's obligations in Paragraph 3(d).  The Court further concludes that upon his removal

as Trustee in August 2015, Scott ceased to have the right, power, or obligation to make a

direction as to the manner of payment to the Trust under Paragraph 3(d)(B)(v).

Courts in New York have dismissed breach of contract claims where the contract,

"contrary to the plaintiff's contention . . . contains no provision obligating the moving defendants

to [take actions] as alleged in the complaint," so that "plaintiff failed to state a cause of action for

breach of contract based upon those alleged obligations."  Witty v. 1725 Fifth Avenue

Corporation, 170 A.D.3d 781, 784 (2nd Dep't 2019).  See also Angelino v. Francis J. Angelino,

D.D.S., P.C., 83 A.D.3d 1186, 1188 (3rd Dep't 2011) (citations omitted) (affirming dismissal of

complaint and concluding that under "[u]nder a literal interpretation of the agreement," "which

was 'negotiated between sophisticated, counseled business people negotiating at arm's length,'"

an LLC was under no obligation to collect the rent payments that the plaintiff sought and

individual defendants owed no obligation to the plaintiff to pay any additional rent, contrary to

plaintiff's claims).  Similarly, here, the Court concludes that Paragraph 3(d) does not obligate

SLD 500 and Scott in the way that plaintiffs allege.

Plaintiffs also assert that "both defendants," i.e., Scott and SLD 500, breached

Paragraph 3(d) of the Agreement because, for each alleged breach, "[d]efendants should have,

but did not, (a) follow the instructions of either Warren Diamond or Faith Diamond in terms of

how distributions should be made; or (b) cause distributions to be made at times when over

$50,000 was in 500 Lincoln's bank accounts."  (ECF 115 at 36.)[4]  But no provision of the

---

[4] Plaintiffs also argue that "[d]efendants cannot prove their defense that Scott Diamond did not violate the material covenants of Section 3 concerning automatic distributions."  (ECF 115 at 37; see also id. at 40 (footnote omitted) ("Defendants likewise cannot prove their separate defense that the material covenants of Section 3 somehow do not apply to any of 500 Lincoln's main bank accounts. . . .").)  Of course, it is plaintiffs who have the burden of

Agreement obligates <u>anyone</u> to follow the instructions of Warren Diamond; the Agreement provides that 500 Lincoln must follow either Scott's instructions as Trustee or the instructions of Scott's successor as Trustee, which, after August 2015, was Faith.  Warren is the beneficiary of the Trust, but not a Trustee; therefore, he was not authorized to directly make the payment instructions to 500 Lincoln under this provision of the Agreement.

   According to plaintiffs, the Second Amendment to the Trust Agreement directed the Trustee to make payments in accordance with Warren's directions.  (ECF 115 at 21.)  But the Trust Agreement is not the agreement under which the plaintiffs have brought this action for breach of contract, and it cannot vary or modify the terms of the 2012 multi-party Agreement.[5]

   Moreover, any role that Scott or SLD 500 has in controlling payments made by 500 Lincoln is not governed by the 2012 Agreement; it would instead be governed by 500 Lincoln's or SLD 500's operating agreements, neither of which is the basis for plaintiffs' breach of contract claim.  In urging that Scott is liable for "causing" 500 Lincoln to make certain payments, plaintiffs explain that, prior to the execution of the 2012 Agreement, "Scott Diamond objected to the actions of Frydman and Rutter, who had also established Automatic Clearing House ('ACH') transactions to make periodic distributions from 500 Lincoln.  Scott Diamond believed these ACH transactions violated 500 Lincoln's operating agreement.  Therefore, in 2012, he affirmed he was both within his rights and obligated, as a Manager of 500 Lincoln, to stop them."  (ECF 115 at 6.)  But in this action, plaintiffs do not seek to enforce SLD 500's

---

establishing each of the elements of their breach of contract claim; defendants do not have the burden to "prove their defense" (and defendants have not raised any affirmative defenses).  See Martinez v. Agway Energy Services, LLC, 88 F.4th 401, 409 (2d Cir. 2023) (citation omitted).  Defendants do, however, have the burden of proving that liquidated damages are a penalty, should the Court reach that issue.  JMD Holding Corporation v. Congress Financial Corporation, 4 N.Y.3d 373, 380 (2005).

[5] The Amended Complaint asserts that the 2012 Agreement "requires Scott Diamond and SLD 500 to cause 500 Lincoln to make monthly distributions from the Citibank Account of sums in excess of $50,000.00 to the members of the affiliated holding companies that own interests in 500 Lincoln," but that statement is inaccurate.  The plain text of the 2012 Agreement requires 500 Lincoln to make payments.  (ECF 8 ¶¶ 24, 49.)

obligations as co-manager under 500 Lincoln's operating agreement.  Rather, plaintiffs' claims are premised upon a breach of the 2012 Agreement.  Plaintiffs may not conflate SLD 500's obligations as a co-manager of 500 Lincoln with Scott and SLD 500's contractual obligations under the 2012 Agreement.

          3.  <u>A Generalized Obligation of Defendants as Signatories to the Agreement</u>

Plaintiffs assert that "both Scott Diamond and SLD 500 are individual parties to the Agreement who are also signatories."  (ECF 122 at 2, 3-4.)  Plaintiffs thus argue that because SLD 500 and Scott are each signatories to the Agreement, each of them agreed to enforce all of the Agreement's covenants, including Paragraphs 3(d) and 17.  It is true that Scott signed the Agreement both on behalf of SLD 500 and in his individual capacity.  But this does not mean that Scott and SLD are obligated to fulfill a provision that requires a separate legal entity, 500 Lincoln, to make payments in a certain way.

The single case plaintiffs cite in support of their argument is unavailing.  Plaintiffs argue that, because Scott signed the Agreement as an individual, the principle of New York law that "persons may not be held personally liable on contracts of their corporations, <u>provided</u> <u>they</u> <u>did</u> <u>not</u> <u>purport</u> <u>to</u> <u>bind</u> <u>themselves</u> <u>individually</u> under such contracts" imparts liability to Scott. (<u>Id.</u> at 4 (quoting <u>Wiernik v. Kurth</u>, 59 A.D.3d 535, 537 (2nd Dep't 2009) (emphasis added)).) But while New York courts have indeed held that a party who signs a contract in both their representative and individual capacities may have intended to be bound personally by the contract, <u>see</u> <u>Salzman Sign Company v. Beck</u>, 10 N.Y.2d 63, 67 (1961), plaintiffs are eliding or ignoring the distinction between Scott and SLD 500 being <u>signatories</u> to the Agreement and Scott and SLD 500 having <u>different</u> <u>obligations</u> under various sections of the Agreement.

Plaintiffs continue to press this theory as they assert that Scott and SLD 500 "both agreed, as parties to the contract or explicitly as 'Scott Diamond' to comply with each of the covenants set forth in Section 3 and Section 4, and in relation to the distributions to the Diamond Trust, both agreed to comply with the directions of the 'trustee of the Warren Diamond Trust.'" (ECF 122 at 4 (internal citations omitted).)  But, as explained above, each of the covenants in Paragraphs 3 and 4 containing references to "Scott Diamond" is delineated carefully by his particular role in each provision.  Scott was no longer obligated as Trustee under Paragraph 3(d)(B)(v) once he ceased to be Trustee.  And again, 500 Lincoln is obligated under Paragraph 3(d) to "comply with the directions of the" Trustee; the role of SLD 500 as a co-manager of 500 Lincoln is not encompassed by that provision.

### 4. Piercing the Corporate Veil

Per the plain text of Paragraph 3(d), 500 Lincoln was obligated to pay the Trust's 12.5% distribution as Scott or his successor Trustees directed.  As defendants note, no obligations are directly imposed on SLD 500 by this paragraph.  (ECF 119 at 5.)  If plaintiffs had wished to pursue a theory that Scott or SLD 500 was liable for the actions of 500 Lincoln in making impermissible payments, they were required to plead a potentially viable claim against 500 Lincoln.

Under New York law, neither the members nor the managers of a limited liability company can be held individually liable for the LLC's obligations.  See N.Y. Limited Liability Company Law § 609(a) ("Neither a member of a limited liability company, a manager of a limited liability company managed by a manager or managers nor an agent of a limited liability company (including a person having more than one such capacity) is liable for any debts,

14

obligations or liabilities of the limited liability company or each other, whether arising in tort, contract or otherwise, solely by reason of being such member, manager or agent or acting (or omitting to act) in such capacities or participating (as an employee, consultant, contractor or otherwise) in the conduct of the business of the limited liability company."). An LLC, in fact, may validly be set up for the express purpose of avoiding personal liability. See Board of Managers of 325 Fifth Ave. Condominium v. Continental Residential Holdings LLC, 149 A.D.3d 472, 475 (1st Dep't 2017) (citing Bartle v. Home Owners Cooperative, Inc., 309 N.Y. 103, 106 (1955)). However, a "party may seek to hold a member of an LLC individually liable despite this statutory proscription by application of the doctrine of piercing the corporate veil." Board of Managers of Beacon Tower Condominium v. 85 Adams Street, LLC, 136 A.D.3d 680, 682 (2d Dep't 2016) (citation omitted).

It is not clear that a veil-piercing claim can be brought against a manager of an LLC who is not a member (owner) of the LLC under New York law. See Board of Managers of 325 Fifth Ave. Condominium, 149 A.D.3d at 475 (quoting ABN AMRO Bank, N.V. v. MBIA Inc., 17 N.Y.3d 208, 229 (2011)) (emphasis in original) (explaining that "[t]o be sure, veil-piercing applies to LLCs. However, '[t]he party seeking to pierce the corporate veil must establish that the owners, through their domination, abused . . . the corporate form . . . such that a court in equity will intervene,'" and dismissing breach of contract claims against parties for which "[t]he complaint does not allege that [parties] have any ownership interest in [the defendant LLC] . . . ."). The members of 500 Lincoln are Tunnel and Corem, not Scott or SLD 500; neither Scott nor SLD 500 has any ownership interest in 500 Lincoln. In any event, plaintiffs explicitly stated at the Final Pre-Trial Conference that they were not attempting to pierce the corporate veil in this action. (Tr. at 30; see also ECF 122 at 2, 3-4.)

5.  <u>Scott's Obligations as Trustee Prior to and After His Removal</u>

The Court considers the pre-August 7, 2015 alleged breaches by Scott while Scott was still serving as a Trustee, i.e., prior to August 7, 2015.

a.  <u>Pre-August 7, 2015</u>

On August 7, 2015, Scott was removed as Trustee of the Warren Diamond Trust, but during the period between April and August 7, 2015, Scott was, in fact, either sole Trustee or co-Trustee with Faith.

Under Paragraph 3(d)(B)(v), Scott or his successors as Trustee had the power to direct the manner in which 500 Lincoln made the 12.5% payment that was due to the Trust.  500 Lincoln, in turn, had to make that payment in the manner that Scott, or his successors as Trustee, directed.  Under the 2012 Agreement, the Trustee's direction was not open to challenge by 500 Lincoln.  Of course, an imprudent direction might expose the Trustee to liability for breach of fiduciary duty or a breach of the Trust Agreement.  But plaintiffs have asserted no claim for breach of fiduciary duty or breach of the Trust Agreement.

In this action, plaintiffs have asserted no viable claim under the 2012 Agreement that Scott is liable to plaintiffs for any direction made to 500 Lincoln.

b.  <u>Post-August 7, 2015</u>

After Scott was removed as Trustee, Faith replaced him as sole Trustee from August 7, 2015 onward.  (Tr. at 8.)  Once Scott was no longer a Trustee, he no longer had the power to direct the Trust's 12.5% distributions.  Plaintiffs also conceded this point at the Final Pre-Trial Conference:

> THE COURT: If you're not a trustee[,] if you're removed as trustee, you resign as trustee or you die, you would seem on its face to no longer be governed by the provision of the 2012 agreement that covers the conduct of the trustee because you're not a trustee.

[Plaintiffs' Counsel]: . . . it's not that you're no longer governed by it, it's essentially Scott refused to acknowledge that he was removed as trustee and had no power to direct how distributions would be made. That is what the problem is . . . . He continued to act as trustee [after August 2015].

THE COURT: But he wasn't?

[Plaintiffs' Counsel]: Correct.

THE COURT: This is not a tort action, not a fraud action and not a breach of fiduciary duty action.  It's a contract action.

[Plaintiffs' Counsel]: That's correct.

THE COURT: . . . Now, in that situation if he ceases to be a trustee, how can he be bound by the obligations imposed on the trustee?  Your position is he was not a trustee.

[Plaintiffs' Counsel]: As a co-manager and a party to the agreement when he received the directives and was aware as to how funds were to be distributed, those directives from the Diamond Trust, he was obligated to ensure that that happened.

THE COURT: Now this is in a different capacity. . . .  (Tr. at 19-20; <u>see also id.</u> at 29.)

Scott's obligation as Trustee under the 2012 Agreement, governed by Paragraph 3(d), ended in August 2015.  Legally, then, once Scott ceased to be Trustee, the "successor trustee" had the power under Paragraph 3(d)(B)(v) to direct payments; Scott cannot be held liable for failing to act in a role that he no longer legally held during the time of the alleged conduct.  Plaintiffs' attempts to claim a breach of Scott's duties as Trustee under this Agreement after he was removed as Trustee are unavailing and conflate Scott's role as Trustee with SLD 500's role as co-manager and Scott's individual obligations.  Defendants are therefore correct when they argue that under Paragraph 3(d), "if Scott ceased to be the trustee of the Diamond Trust, then [500] <u>Lincoln</u>—not Scott or SLD 500—would take direction from the <u>new</u> trustee of

the Diamond Trust, and Scott would not have any further involvement with respect to the automatic distributions set forth in paragraph 3(d) of the Agreement."  (ECF 119 at 5 (emphasis in original).)

        B.  <u>Closing of the Lincoln Citi Account</u>

        Finally, the parties spend much of their briefing debating whether the closure of the "Lincoln Citi Account" renders Paragraph 3(d) invalid or ambiguous.  The Lincoln Citi Account, from which 500 Lincoln made its automatic monthly distributions, was closed in October 2015, apparently due to unrelated litigation between Frydman's companies and Citibank.  (ECF 119 at 23.)

        Before the Final Pre-Trial Conference in this matter, the Court ordered both parties to submit their answers to several questions in dispute, including whether they contended that any term in the 2012 Agreement was ambiguous.  Both parties submitted that their positions were that no term of the contract was ambiguous.  Specifically, plaintiffs wrote that they did "not contend that any material provision of the Diamond Trust or the December 12, 2012 Agreement is ambiguous."  (ECF 112 at 3.)  Plaintiffs, however, followed this with two pages arguing that defendants "may assert" that the term "'Lincoln Citi Account,' as said term is defined in ¶ 3(a) of the December 12, 2012 Agreement, does not encompass any other account of 500 Lincoln, LLC . . . and 500 Owner, LLC . . . ."  (<u>Id.</u> at 3-5.)  At the Final Pre-Trial Conference itself, the Court again asked the parties whether they contended that any term of the 2012 Agreement was ambiguous.  Again, both parties represented to the Court that they did not believe any term was ambiguous.  (Tr. at 4.)  In their briefing submitted after the Final Pre-Trial Conference, however, plaintiffs asserted that the term "Lincoln Citi Account" is ambiguous.  (<u>See</u> ECF 115 at 2 ("As

shown by a contextual reading of the term in relation to the entire agreement, the definition of 'Lincoln Citi Account' set forth in Section 3(a) is ambiguous such that it cannot be reconciled without allowing the jury to resort to parol evidence."); id. at 35 (same language); id. at 40 (same language).)

The "Lincoln Citi Account" is not an ambiguous term.  With crystal clear precision, it is a defined term in Paragraph 3(a) of the Agreement as "500 Lincoln's account at Citibank N.A. Branch # 735, Account # 59211304."  Neither Scott, individually or as Trustee, nor SLD 500 was obligated under the 2012 Agreement to keep the account open.  The obligation, implicit though it may have been, belonged to 500 Lincoln.

While the Amended Complaint discusses the accounts in which the 12.5% payments by 500 Lincoln to the Trust were deposited, it nowhere alleges that distribution payments by 500 Lincoln were ceased because the "Lincoln Citi Account" was closed.  The account is referenced twice in the Amended Complaint (ECF 8 ¶¶ 23-24), but no liability on anyone's part is asserted by reason of the closure.  The Stipulations of Fact refer to periods after October 2015 (the purported date of the account closure) in which distributions were made or were not made by 500 Lincoln, but plaintiffs' Amended Complaint does not allege that any failure to make a distribution was causally related to the closure of the Lincoln Citi Account. (ECF 101.)

Plaintiffs' arguments that the closure of the account rendered the Agreement ambiguous is baseless.  The issue is a red herring insofar as it relates to the claims asserted in the Amended Complaint.

CONCLUSION

       Because the Court concludes that neither Scott nor SLD 500 can be held liable for a breach of the 2012 Agreement, it need not reach the issue of liquidated damages.

       Upon full briefing by the parties, the Court has construed the plain language of the Agreement in accordance with the manifest intent of the parties.  The two contract-based claims asserted by Warren Diamond and Faith Diamond as Trustee against Scott Diamond and SLD 500 are foreclosed.  Based upon the definitive and final interpretation of the Agreement set forth herein and principles of New York law, defendants may formally move for judgment on the pleadings, Rule 12(c), Fed. R. Civ. P., within 7 days, and plaintiffs may respond 7 days thereafter.  The Court will advise if it requires a reply submission.


       SO ORDERED.


P. Kevin Castel
United States District Judge


Dated:      New York, New York
           May 8, 2024

**Appendix A**

**Paragraph 3(d)**

3. <u>**Automatic Monthly Distribution of Balance Existing Cash Reserves: Distributions**</u>

> . . . (d)  As a material inducement to entering into this agreement, each of the Parties hereto agree that except as otherwise provided herein, and except as may be determined in a subsequent written agreement signed and notarized by Frydman (or his successors as manager of Tunnel) and Rutter (or his successors as manager of Tunnel) and Scott Diamond (as manager of SLD 500 LLC, or his successors, as manager of SLD 500 LLC) 500 Lincoln shall make automatic monthly distributions from the Lincoln Citi Account of ***all sums*** then in the Lincoln Citi Account in excess of fifty thousand Dollars ($50,000) as follows: A) the first distribution of funds following the signing of this Agreement, shall be done by the Managers: $100,000 thereof to Morrison Cohen LLP; $100,000 thereof to Brief Carmen & Kleiman, LLP; $150,000 thereof to Tunnel, $150,000 thereof to Corem; and $113,000 thereof to the 500 Lincoln Lockbox Account. Additionally, $40,000 shall be immediately moved from the 500 Lincoln Money Market Account to the 500 Lincoln Checking/Operating Account; B) all distributions thereafter, through automatic electronic disbursements through the Automated Clearing House ("ACH") to the beneficial owners of Tunnel and Corem, proportionately as follows: (i) twenty five percent (25%) as directed by Frydman (or his successors); (ii) twenty five percent (25%) as directed by Rutter (or his successors); (iii) twenty five percent (25%) as directed by Sal Cannizzaro (or his successors); (iv) twelve and one-half percent (12.5%) as directed by Grace and/or John DelMonaco (or their successors); and (v) twelve and one-half percent (12.5%) as directed by Scott Diamond (or his successors as trustee of the Warren Diamond Trust).

(ECF 8-1 ¶ 3(d) (emphasis in original)).